IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CORI L. WILLIAMS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | CIV. ACT. NO. 1:13cv198-TFM <br> (WO) |

**MEMORANDUM OPINION and ORDER**

**I.  Procedural History**

Plaintiff Cori L. Williams ("Williams") applied for supplemental security income benefits pursuant to Title XVI, 42 U.S.C. § 1381 *et seq*., alleging that she is unable to work because of a disability. Her application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ concluded that Williams was not under a "disability" as defined in the Social Security Act. The ALJ, therefore, denied the plaintiff's claim for benefits. The Appeals Council rejected a subsequent request for review. Consequently, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Pursuant to 28 U.S.C. § 636(c), the parties have consented to

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

1

entry of final judgment by the United States Magistrate Judge.  The case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  Based on the court's review of the record in this case and the parties' briefs, the court concludes that the Commissioner's decision should be AFFIRMED.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination, the Commissioner employs a five-step, sequential evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial

---

[2] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986)  is a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. The Issues

#### A.     Introduction

Williams was 26 years old at the time of the hearing and is a high school graduate. (R. 38-39). She has prior work experience as a horse trainer, cart attendant, and waitress. (R. 41-42). Williams alleges that she became disabled on June 17, 2009 due to migraine headaches and fibromyalgia. (R. 43, 140). After the hearing on March 7, 2011, the ALJ found that Williams suffers from severe impairments of fibromyalgia and migraine headaches. (R. 23). The ALJ found that Williams is unable to perform her past relevant work, but that she retains the residual functional capacity to perform light work "except that she must alter her positions every two hours and is limited to the performance of

simple, routine, and repetitive tasks to accommodate complaints of pain and medication side effects." (R. 26). Testimony from a vocational expert led the ALJ to conclude that a significant number of jobs exist in the national economy that Williams can perform, including work as an information clerk, garment bagger, and cashier. (R. 29). Accordingly, the ALJ concluded that Williams is not disabled. (R. 34).

### B. The Plaintiff's Claims

Williams presents the following issues for review:

(1)  The Commissioner's decision should be reversed because the ALJ failed to provide good cause for her rejection of the opinion of Dr. Connie Chandler, Williams' treating physician.

(2)  The Commissioner's decision should be reversed because the ALJ failed to address the entire opinion of Dr. Prameela Goli, an examining physician.

(Doc. No. 12).

### IV.  Discussion

### A. Rejection of Treating Physician's Opinion

Williams argues that the ALJ improperly rejected Dr. Chandler's opinion about the severity of her limitations. In essence, the plaintiff argues that if the ALJ accepted the opinion of the family practitioner about her physical impairments, she would be disabled. On March 2, 2011, Dr. Chandler completed a clinical assessment of pain form, in which she found that pain is present to such an extent as to be distracting to adequate performance of daily activities or work, that physical activity greatly increases pain to

such a degree as to cause distraction from tasks or total abandonment of a task, and that the side effects of prescribed medication can be expected to be severe and would limit effectiveness due to distraction, inattention, and drowsiness. (R. 259). Dr. Chandler also completed a physical capacities evaluation form, in which she found that Williams is able to lift no more than ten pounds occasionally to five pounds frequently; sit no more than one to two hours and stand no more than one hour during an eight-hour workday; never climb, bend or stoop; that she can rarely push or pull, reach or work around hazardous machinery; is likely to be absent from work more than four days per month; and requires an assistive device to ambulate during a normal workday. (R. 260). Dr. Chandler noted that her opinion about Williams' physical capacity is based on her diagnosis of severe fibromyalgia and because Williams "is in constant pain [and] requires Lortab for pain control[,] . . . is pregnant at this time [and] also has had several emergency room visits for intractable pain." (*Id*).

The law is well-settled; the opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so. *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The Commissioner, as reflected in his regulations, also demonstrates a similar preference for the opinion of treating physicians.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 CFR § 404.1527 (d)(2)).  The ALJ's failure to give considerable weight to the treating physician's opinion is reversible error.  *Broughton*, 776 F.2d at 961-2; *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir. 1982).

However, there are limited circumstances when the ALJ can disregard the treating physician's opinion.  The requisite "good cause" for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding.  *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  Good cause may also exist where a doctor's opinions are merely conclusory; inconsistent with the doctor's medical records; or unsupported by objective medical evidence.  *See Jones v. Dep't. of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991); *Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991); *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987). The weight afforded to a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence of the claimant's impairment.  *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986).  The ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).  The ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion. *Schnorr*, 816 F.2d at 581.

After reviewing all the medical records, the ALJ discounted the opinion of Dr. Chandler as set forth in the physical capacities and clinical assessment of pain forms

because the findings "are not supported by or consistent with the remainder of the objective record or her own treatment notations of record." (R. 27). Specifically, the ALJ found as follows:

> . . . The claimant presented for treatment to Dr. Chandler on limited occasions between late November 2009 through early September 2010 and offered assessments of lumbar spine pain, cervical pain, fibromyalgia, and deep vein thrombosis of the left leg. Dr. Chandler prescribed the claimant medications as appropriate, but her notations did not document her medical source opinions that the claimant was totally debilitated by symptomatology, including pain, or medication side effects. Dr. Chandler noted in opinion evidence that the claimant required an assistive device to ambulate even minimally in a normal workday, but the undersigned can find no reference in her notations to the claimant's medical necessity with regard to the use of a cane. Additionally, according to Dr. Goli, the claimant did not require the use of a cane to ambulate.

(*Id*).

The ALJ's determination is supported by substantial evidence. The extreme limitations identified by Dr. Chandler in the physical capacity evaluation and clinical assessment of pain forms are not supported by her own treatment records. The medical records indicate that Leslie Canfield, a nurse practitioner at Dr. Chandler's office, examined Williams five times between November 2009 and September 2010. (R. 209-210, 216-217, 257-58). On November 23, 2009, Williams presented to the nurse practitioner with complaints of pain "from head to toe." (R. 209). The nurse practitioner noted Williams had a full range of motion of extremities with joint tenderness, that she was pregnant, and that she smoked half of a pack of cigarettes a day. (R. 209-210). She diagnosed Williams as suffering from lumbar spine pain, cervical pain, and fibromyalgia, prescribed Flexeril, and referred her to a rheumatologist for the treatment of fibromyalgia during pregnancy. (*Id*). On December 11, 2009, Williams returned to the nurse

7

practitioner, complaining of fibromyalgia pain and that her prescription for Flexeril "did not help [with] the pain whatsoever." (R. 217). She also reported that it takes her ten minutes to get out of bed in the morning. (*Id.*) The nurse practitioner prescribed Lortab, noting the risks of taking medication during pregnancy. (*Id.*) On June 24, 2010, Williams returned to the nurse practitioner complaining that her fibromyalgia was "flaring up" over the past six months. (R. 216). The nurse practitioner prescribed Savella and Ultram. (*Id*). Laboratory tests conducted on June 28, 2010, revealed low Vitamin D levels. (R. 219). The nurse practitioner prescribed vitamin supplements. (*Id*).

Upon her return to the nurse practitioner on September 2, 2010, Williams reported that medical personnel at Flowers Hospital found a blood clot in her left leg and complained that Savella did not alleviate her pain. (R. 258). The nurse practitioner noted that Williams was a patient at Houston Prenatal Group and diagnosed Williams as suffering from deep vein thrombosis. (*Id*). On September 7, 2010, both Dr. Connie Chandler and the nurse practitioner conducted an examination. (R. 257). Dr. Chandler noted that Williams was pregnant and diagnosed her with deep vein thrombosis and fibromyalgia. (Id). She prescribed Lovenox and Flexeril. (*Id*).

With the exception of one examination by Dr. Chandler to treat Williams' deep vein thrombosis, all of the examinations during the relevant time period were conducted by the nurse practitioner. In addition, the medical records indicate that Williams sought treatment from Dr. Chandler on an infrequent basis. For example, she did not seek treatment from Dr. Chandler or the nurse practitioner until six months after her December 11, 2009 appointment. In addition, nothing in either the nurse practitioner's or Dr.

8

Chandler's notes indicates that Williams suffered any side effects from medication or required an assistive device. This court therefore concludes that the discounting of Dr. Chandler's opinion that Williams suffers from extreme limitations on the basis that the general practitioner's opinion is inconsistent with her own medical records is supported by substantial evidence.

The ALJ's rejection of Dr. Chandler's conclusory opinion is also supported by other evidence in the record. For example, on September 24, 2009, Williams went to Dr. H. Kesserwani, a rheumatologist, with complaints of very bad headaches "averaging two a month [and lasting] up to seven days, mostly occipital, severe, associated with photophobia and phonophobia." (R. 196). Dr. Kesserwani noted that Williams was four months pregnant and smokes half of a pack of cigarettes a day. (*Id*). He diagnosed her as suffering from episodic migraine and prescribed Periactin for migraine prevention. (R. 197). Dr. Kesserwani recommended bilateral occipital nerve blocks if Williams' condition did not improve. (*Id*).

Two days later on September 26, 2009, Williams went to the emergency room at Dale Medical Center complaining of a migraine and reporting that Tylenol did not alleviate her symptoms. (R. 179-180). An emergency room physician diagnosed Williams as suffering from a migraine headache and prescribed Demerol and Phenergan. (R. 180).

On September 29, 2009 -- five days after her initial visit, Williams returned to Dr. Kesserwani's office. (R. 195). The rheumatologist administered a greater occipital nerve block and suprascapular nerve block. (*Id*).

On October 30, 2009, Dr. Kesserwani wrote a letter "to whom it may concern" in which he stated that Williams was "started . . . on migraine preventive Periactin," that "[s]he withdrew from school for medical reasons," and that "[h]er withdrawal is legitimate." (R. 194).

On November 6, 2009, Williams went to the emergency room at Flowers Hospital complaining of sharp cramping abdomen pain and back pain. (R. 185). Medical personnel noted that Williams smokes cigarettes. (*Id*). The emergency room physician's clinical impression was acute abdominal pain intrauterine pregnancy. (R. 186). The physician advised Williams to take Acetaminophen. (R. 187).

On November 7, 2009, Williams went to the emergency department at Dale Medical Center, complaining of nausea. (R. 176). Medical personnel found no muscle spasms or tenderness upon examination. (*Id*). A physician's clinical impression was pregnancy-related nausea. (R. 177).

On November 11, 2009, Dr. Kesserwani administered an occipital nerve block and suprascapular nerve block. (R. 193). He noted that "occipital nerve blocks have worked beautifully." (R. 192).

On November 15, 2009, Williams presented to the emergency department at Medical Center Enterprise, complaining of pain in multiple sites at a level of 5 at that time and eight at its maximum intensity on a ten-point scale. (R. 199-201). Dr. Rick Harrelson's clinical impression was fibromyalgia and five-month pregnancy. (R. 203). Dr. Harrelson prescribed Lortab. (R. 203).

On December 16, 2009, Williams went to Dr. Edmund G. LaCour, a rheumatologist, complaining of pain from "head to toe" with diffuse tenderness to touch, and achiness and stiffness in the mornings when getting out of bed. (R. 215). Upon conducting a joint exam, Dr. LaCour found "excellent pain-free motion throughout, without any swollen or particularly tender joints. Soft tissue exam is notable for moderate widespread tenderness." (R. 215). His diagnostic assessment was "syndrome compatible with fibromyalgia, developing in her fourth month of pregnancy." (R. 215). Dr. LaCour noted that there is no safe medication for fibromyalgia that may be taken during pregnancy and that Williams would "have to wait until she has delivered and has stopped nursing before initiating any." (R. 214).

On March 25, 2010, Williams returned to Dr. LaCour with complaints of widespread myalgia. (R. 213.) Dr. LaCour found significant widespread soft tissue tenderness and assessed fibromyalgia. (*Id*). He also recommended as follows:

> Because she is breast-feeding, there is nothing that she can take safely as approved for treating fibromyalgia. Once she has stopped breast-feeding, she will certainly be a candidate for Cymbalta or Savella. Neurontin or Lyrica could be considered. She was given 60 mg of Toradol IM today, but was informed that there are no studies documenting the safety of using this on an ongoing basis. She will follow up with her primary care physician regarding fibromyalgia.

(*Id*).

Five days later, on March 30, 2010, Williams went to the emergency department at Flowers Hospital complaining of chest pain. (R. 252). She reported that one week earlier "she had a friend pop her back and she had the immediate onset of left sided rib cage pain." (*Id*.) An emergency room physician recommended that she not allow anyone to

pop her back and prescribed Norflex, Decadron, and Percocet. (R. 254). On April 15, 2010, Williams returned to Flowers Hospital complaining of a headache, right shoulder pain, and a "fibromyalgia flare up." (R. 250). An emergency room physician's clinical impression was acute non-specific headache, fibromyalgia, and right shoulder pain. (R. 251). The doctor prescribed Lortab and Robaxin. (*Id*).

On June 8, 2010, Williams went to the emergency department complaining of pain in multiple sites with gradually worsening symptoms over a seven-month period. (R. 246). The emergency room physician noted positive joint pain and myalgias. (R. 246). His clinical impression was chronic pain. (*Id*). Williams was prescribed Anaprox. (*Id*).

On August 11, 2010, Williams returned to the emergency room complaining of knee pain. (R. 243). Upon discharge, Williams was provided with crutches, a knee immobilization device, and a prescription for Decadron. (R. 245). Williams went to the emergency room again on August 14, 2010, complaining of knee pain. (R. 241). The emergency room physician's clinical impression was a ligamentous sprain to the left knee. (*Id*). The physician prescribed Vicoprofen. (*Id*).

On August 20, 2010, Williams returned to Flowers Hospital, complaining of lower leg pain and swelling after spraining her knee between the crib and the wall while holding her newborn infant. (R. 238). The emergency room physician, Dr. A. Roland Spedale, noted that Williams smokes one pack of cigarettes a day and that she "smoked all throughout her last pregnancy." (*Id*). He also noted:

> She has been advised by numerous people through the hospitalization for smoking cessation. She states she has smoked through all her pregnancies and is told to do so by her family because they cannot

12

stand her due to her moodiness without smoking. She states they "throw a pack of cigarettes and lighter at her head and tell her to smoke." (R. 232).

Williams was admitted to the hospital and administered anticoagulation medication. (R. 239). Dr. Spedale noted that Williams was "currently nonweightbearing on the left lower extremity and was using crutches and a wheelchair through this admission." (R. 232). Upon discharge, Dr. Spedale diagnosed Williams as suffering from (1) extensive left lower extremity deep vein thrombosis; (2) left knee sprain; (3) five and a half weeks pregnant; (4) tobacco use against medical advice; (5) fibromyalgia; (6) chronic migraines; and (7) chronic pain syndrome status post motor vehicle accident. (R. 231).

On September 15, 2010, Williams returned to Flowers Hospital complaining of fibromyalgia pain in multiple areas, a headache, and nausea. (R. 228). She indicated that Lortab and Flexeril did not relieve her symptoms and that her headache pain was an 8 on a ten-point scale. (*Id*). An emergency room physician's clinical impression was urinary tract infection, pregnancy, and acute non-specific headache. (R. 230). The physician noted that he would not prescribe any prescription pain medication or a muscle relaxer due to pregnancy and that Williams "wanted to go outside and smoke while waiting for discharge papers." (R. 230).

This court therefore concludes that the ALJ's discounting of Dr. Chandler's opinion based on medical evidence in the record is supported by substantial evidence. Other than records of Williams' brief hospitalization for deep vein thrombosis, nothing in

the medical record indicates that Williams was prescribed a cane or other mobility device. Thus, Dr. Chandler's finding that Williams required the use of an assistive device to ambulate during a normal workday is not supported by the medical evidence. Moreover, the record indicates that several of Williams' problems were due to pregnancy-related complications or temporary conditions, such as deep vein thrombosis. In addition, Williams did not seek treatment from a rheumatologist or other specialist on a consistent basis and her headaches and fibromyalgia-related symptoms were treated conservatively. Thus, the ALJ's rejection of Dr. Chandler's opinion that Williams suffers from extreme limitations is supported by substantial evidence.

### B. The Consultative Examiner's Opinion

The ALJ gave considerable weight to the opinion of Dr. Prameela Goli, a consultative rheumatologist. Specifically, the ALJ found:

> . . . The undersigned notes that no credible treating or consultative physician has opined that the claimant was disabled because of any physical or mental condition or from any resulting symptoms. Regarding the claimant's impairments, the undersigned has assigned considerable evidentiary weight to the consultative evaluation findings and medical source statement of Dr. Goli, in that the conclusions she reached are most accurately reflected by the overall, credible objective evidentiary record. Dr. Goli's evaluation reflected a multitude of normal physical findings and her medical source statement is essentially consistent with a residual functional capacity for light work.

(R. 26). The ALJ also discussed Dr. Goli's findings as follows:

> . . . [C]onsultative evaluator Dr. Goli observed during physical examination that the claimant was able to get onto the examination table without difficulty. Dr. Goli found that the claimant's cervical spine exam was normal with a normal range of motion, but that she experienced some tenderness over the paracervical muscles. Examination of the dorsal lumbar spine showed tenderness of the lumbar area, and the straight leg test

14

>was normal. Dr. Goli detected normal reflexes, good sensory function, good motor power, and a normal spine range of motion. Dr. Goli also found, regarding the claimant's upper extremities and shoulders, that she had good range of motion on both sides and that her elbows were normal. Further, the claimant's wrists, PIP joints, and DIP joints were normal, and she displayed normal reflexes and good strength. Additionally, Dr. Goli observed the claimant's good sensory function and good motor power, as well as negative Tinel's and Phalan signs. Regarding the claimant's lower extremities and hips, Dr. Goli noted normal range of motion, normal knees with no swelling, and normal ankle examination. Regarding the lower extremities, Dr. Goli found normal reflexes, good sensory function, and good motor power.

(R. 28).

Williams asserts that the ALJ's reliance on Dr. Goli's findings when determining she has the residual functional capacity to perform light work is not supported by substantial evidence because the ALJ failed to consider the consultative rheumatologist's opinion in its entirety. Specifically, Williams argues that the ALJ failed to consider Dr. Goli's opinion that she would be limited to occasional climbing, balancing, kneeling and stooping and may occasionally be around unprotected heights, moving vehicles, and mechanical parts. (R. 13).

An ALJ is required to independently assess a claimant's residual functional capacity "based upon all of the relevant evidence." 20 C.F.R. § 404.1545(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence."); 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level. . ., the administrative law judge . . . is responsible for assessing your residual functional capacity."). *See also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The residual functional capacity is an assessment, based upon all of the

relevant evidence, of a claimant's remaining ability to do work despite his impairments."). "Residual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms. 20 C.F.R. § 416.945(a)." *Peeler v. Astrue*, 400 Fed. Appx. 492, 494 n.2 (11th Cir. 2010).

The court cannot conclude that the ALJ's omission of Dr. Goli's specific findings concerning postural restrictions establishes that the ALJ's determination that Williams has the residual functional capacity to perform light work is not supported by substantial evidence. "'An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.'" *Ward v. Astrue*, No. 1:11cv147-TFM, 2012 WL 607642, *9 (M.D. Ala. 2012) (quoting *McCray v. Massanari*, 175 F.Supp.2d 1329, 1336 (M.D. Ala. 2001)). The ALJ gave considerable weight to the opinion of the consultative rheumatologist because his conclusions were more "accurately reflected by the overall, credible objective evidentiary record." (R. 26). Moreover, Williams conveniently ignores the parts of Dr. Goli's opinion indicating that she is not as disabled as alleged, including his findings that she has complete normal range of motion, is able to frequently carry or lift an 11 to 20 pound box, and does not require the use of a cane to ambulate. (R. 264-267). In addition, the jobs identified the vocational expert require no more than occasional climbing, balancing, stooping, kneeling, and crawling, and do not include any moving mechanical parts or hazards. *See* DOT #237.367-018; 920.687-018; 211.462-010.

Pursuant to the substantial evidence standard, this court's review is a limited one; the entire record must be scrutinized to determine the reasonableness of the ALJ's findings. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992). The ALJ evaluated all the evidence before her which led her to conclude that Williams can perform light work. It is not the province of this court to reweigh evidence, make credibility determinations, or substitute its judgment for that of the ALJ. Instead the court reviews the record to determine if the decision reached is supported by substantial evidence. *Moore v. Barnhart*, 405 F.3d 108, 1211 (11th Cir. 2005). Substantial evidence "is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* Given this standard of review, the court concludes that the ALJ's residual functional capacity assessment is consistent with the medical evidence as a whole. After a careful examination of the administrative record, the court concludes that substantial evidence supports the conclusion of the ALJ concerning Williams' residual functional capacity to perform light work.

### V. Conclusion

The court has carefully and independently reviewed the record and concludes that substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled. Thus, the court concludes that the decision of the Commissioner is supported by substantial evidence. Accordingly, it is

ORDERED that the decision of the Commissioner be and is hereby AFFIRMED.

Done this 3rd day of February, 2014.

                                           /s/Terry F. Moorer
                                   TERRY F. MOORER
                                   UNITED STATES MAGISTRATE JUDGE